IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NATIONWIDE MUTUAL                  :
INSURANCE COMPANY,
         Plaintiff                 :

                                   :
         vs.                             CIVIL NO. 1:CV-06-0646
                                   :

ELWOOD C. KUENTZLER,               :
Administrator of the Estate of
SHAWN M. KUENTZLER, Deceased,      :
         Defendant

*M E M O R A N D U M*

I.   *Introduction.*

        Invoking our diversity jurisdiction, plaintiff,

Nationwide Mutual Insurance Company, filed this suit against

defendant, Elwood C. Kuentzler, administrator of the estate of

Shawn M. Keuntzler. Nationwide wants a declaration that it has

no obligation to provide coverage to the estate under the

underinsured motorist (UIM) coverage in two policies it issued

to Elwood C. Kuentzler and his wife, Judith Kuentzler. Plaintiff

also wants to enjoin the estate from seeking to recover UIM

benefits under the policies. Defendant has filed a counterclaim

seeking the opposite relief, a declaration that Nationwide must

pay UIM benefits under the policies and an injunction against

Nationwide's denying recovery under the UIM coverages.

        We are considering the parties' cross-motions for

summary judgment. The motions contest three issues: (1) whether

the decedent, Shawn M. Kuentzler was "regularly liv[ing]" in his parent's household in York, Pennsylvania, at the time of his death, as required by the policy language; (2) whether the listing of Shawn M. Kuentzler on one of the policies as one of the "Insured Drivers" means that his estate is entitled to UIM coverage under that policy regardless of his residency at the time of his death; and (3) whether Nationwide is estopped from denying UIM coverage because it paid first-party benefits for accidental death and funeral expenses under the policy that named him as an insured driver. A yes answer to the first or third issues means there is coverage under both policies. A yes answer on the second issue means there is coverage only for that policy. Of course, a no answer on all three means there is no coverage under either policy.

We examine the motions under the well established standard. *See Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

II.   *Background*.

The parties have submitted cross-statements of material fact (SMF). Based on those submissions and the underlying record, the following is the undisputed background to this litigation. We will sometimes borrow the parties' language.

The decedent, Shawn M. Kuentzler, was the son of Elwood C. Kuentzler and Judith Kuentzler. On or about April 4,

2005, Shawn Kuentzler, was a passenger in an automobile owned by Christopher A. Neuman being operated by Neuman in Kenton, Ohio. The car became involved in an accident, and Shawn Kuentzler sustained serious injuries, resulting in his death. At the time, Shawn was thirty-one years old, (doc. 40-10), and living with his fiancee, their daughter, and his fiancee's son in Defiance, Ohio. (Doc. 40. Pl.'s SMF, ¶ 107). Neuman was insured by Progressive Insurance Company. (Doc. 37 and 40, ¶¶ 5-7). Progressive has tendered its $15,000 policy limit for liability coverage. (Doc. 1, Compl. ¶ 12; doc 4, Answer, ¶ 12).

A. *The Nationwide Policies.*

Elwood C. Kuentzler, and Judith Kuentzler have two personal automobile policies with Nationwide. One policy, "No. 529," insures a 1994 Ford Mustang, the other policy, "No. 530," a 2002 Ford Explorer. Both policies have the following provisions. On the "Declarations" page, it states: "These declarations are a part of the policy . . . Your policy provides the coverages and limits shown in the schedule of coverages." The schedule of coverages is also on the declaration page. In pertinent part, the coverages are "comprehensive," "collision," "property damage liability," "bodily injury liability," stacked "underinsured motorists bodily injury," and "first party benefits" electing "option 5." The UIM coverage was $250,000 per person and $500,000 per accident. Each coverage had a corresponding premium amount.

On the declaration page, both policies list Elwood and Judith Kuentzler as "Policyholder (Named Insured)." Both policies also list Elwood and Judith on the declaration page as "Insured Drivers," but No. 530 also lists Shawn as an "Insured Driver." Shawn's listing as an "insured driver" increased the premiums paid for comprehensive, collision, property-damage liability, and bodily-injury liability coverages. The premium for UIM coverage was not affected. (Doc. 47-5, Aff. of Jacob Strevig, ¶¶ 8-12).

After the declaration page, both policies contain the following provisions pertinent to the parties' disputes in this case.

### Insuring Agreement

For the policyholder's payment of premiums and fees in amounts we require and subject to all the terms and conditions of this policy, we agree to provide the coverages the policyholder has selected. These selections are shown in the enclosed Declarations, which are a part of this policy contract.

### Definitions

This policy uses certain common words for easy reading. They are defined as follows:

1. "POLICYHOLDER" means the first person named in the Declarations. The policyholder is the named insured under this policy but does not include the policyholder's spouse. . . .

2. "YOU" and "YOUR" mean:

4

> a) the policyholder and spouse, if
> resident of the same household, when the
> policyholder is a person; . . . .
>
> 3. "RELATIVE" means one who regularly lives
> in your household and who is related to you
> by blood, marriage or adoption (including a
> ward or foster child). A relative may live
> temporarily outside your household.
>
> 4. "INSURED" means one who is described as
> entitled to protection under each coverage.
>
> . . . .
>
> 6. "YOUR AUTO" means the vehicle(s)
> described in the Declarations.

(Doc. 40-2, p. 5 of 40; policy No. 530, p. D1; doc. 40-3, p. 5
of 36; policy No. 529, p. D1).

> ***Underinsured Motorists***
>
> . . . .
>
> ***Coverage Agreement***
>
> **YOU AND A RELATIVE**
>
> We will pay compensatory damages, including
> derivative claims, which are due by law to
> you or a relative from the owner or driver
> of an underinsured motor vehicle because of
> bodily injury suffered by you or a relative.
> Damages must result from an accident arising
> out of the:
> 1. ownership;
> 2. maintenance; or
> 3. use;
> of the underinsured motor vehicle.
>
> **OTHER PERSONS**
>
> We will also pay compensatory damages,
> including derivative claims, which are due
> by law to other persons who suffer bodily
> injury while occupying:
> 1. Your auto.

```
          2. A motor vehicle you do not own, while it
          is used as a temporary substitute for your
          auto. Your auto must be out of use because
          of:
          a) breakdown;
          b) repair;
          c) servicing; or
          d) loss.

          . . . .
```

(Doc. 40-2, p. 5 of 40; policy No. 530, p. U1-U2); doc. 40-3, p. 5 of 36; policy No. 529, p. U1-U2).

Under "First-Party Benefits," there was "combined loss benefits" paying an "accidental death benefit" in the amount of $25,000 for the "policyholder or a relative who suffers accidental bodily injury causing death from a covered accident." (Doc. 40-2, p. 19; policy No. 530, p. F2). In pertinent part, the policy defines "relative" for first-party benefits as: "the following residents of the policyholder's household: (a) spouse; (b) anyone related to the policyholder or spouse by blood, marriage or adoption; and (c) a minor in the legal custody of the policyholder or such relative. A relative may live temporarily outside the household." (*Id.*, p. 18 of 40; policy No. 530, p. F1).

The combined loss benefit also included a funeral benefit in the amount of $2,500. That provision required Nationwide to "pay the reasonable expenses directly related to the: (a) funeral; (b) burial; (c) cremation; or (d) other form of disposition of the remains of a deceased insured." (*Id.*, p. 19 of 40; policy No. 530, p. F2).

In September 2005, under policy No. 530, the one listing Shawn as an "Insured Driver," Nationwide paid the full amount of the death benefit, $25,000, and a funeral benefit in the amount of $2,500. (Doc. 37, Def.'s SMF, ¶¶ 20 and 22).

      B.   *Shawn Kuentzler's Residences and Employment History.*

We take the following background on where Shawn Kuentzler lived and worked from Doc. 40, plaintiff Nationwide's SMF, ¶¶ 16 to 52; Defendant either agrees with the statements, or they are unopposed and supported by the cited record.

      1. From 1991 to June 1996, the decedent, Shawn M. Kuentzler, resided with his parents at their address on Barley Road in York, Pennsylvania;

      2. From June 1996 to 1997, Shawn M. Kuentzler, resided in Surf City, North Carolina.

      3. In 1997, Shawn M. Kuentzler, moved to Ohio for the first time.

      4. From 1997 to February 2002, Shawn M. Kuentzler resided at various addresses around Paulding, Ohio, and Defiance, Ohio.

      5. For two months, from February 2002 to March 2002, Shawn M. Kuentzler stayed at his parent's house on Barley Road in York, Pennsylvania.

      6. In March 2002, Shawn's fiancee moved to York, Pennsylvania, with her son to be with Shawn.

      7. From March 2002 to November 2004, Shawn M. Kuentzler resided on Norway Street in York, Pennsylvania, with his fiancee, her son, and eventually, their daughter.

8. In November 2004, Shawn M. Kuentzler, moved to South Clinton Street in Defiance, Ohio, with his fiancee, her son, and their daughter.

9. Shawn M. Kuentzler resided on South Clinton Street in Defiance, Ohio, from November 2004 until his death in April 2005.[1]

In pertinent part, Shawn had the following work locations:

1. From May 1997 to September 1997, the One-Eyed Parrot restaurant in Surf City, North Carolina.

2. From November 1997 to June 1999, the Kettering Country Club in Defiance, Ohio.

3. From June 1999 to January 2000, J.B. Shakers in Defiance, Ohio.

4. From January 2000 to February 2002, Coyote's Restaurant in Defiance, Ohio.

5. From April 2002 to June 2003, Klinger's Public House in Yocumtown, Pennsylvania.

(Doc. 40, SMF ¶¶ 30, 34-36, and 49).

C.  *Evidence of Shawn Kuentzler's Intended Residence.*

According to the testimony of Shawn Kuentzler's fiancee, the move to Ohio in November 2004 was temporary. Shawn made the move because of a job opportunity so that he could save enough money to return to York and find a residence for her and

_____

[1] Plaintiff has also provided uncontested evidence from voting records, tax records, domestic-relations records, and motor-vehicle records that Shawn did not live or reside with his parents at the time of his death, but we see no need for that evidence to resolve the motions.

their children. (Doc. 37, Defendant's SMF, ¶ 61). According to his fiancee and his mother, when Shawn moved back to York, Pennsylvania, he intended to live with his parents until he could find a permanent residence for his fiancee and their children. (*Id.*, ¶ 62). According to Shawn's father, Shawn considered York his home, and he wanted to live there as soon as he could find suitable employment in the area. (*Id.*, ¶ 67).

Shawn had a room at his parent's house, (*id.*, ¶ 65), and he returned to York about once a month after the November 2004 move to Ohio, staying at his parent's house. (*Id.*, ¶ 66). Shawn received mail at his parent's York address consisting of two or three bills from the same department store, regular mailings from a drug and alcohol rehabilitation center and junk mail. (*Id.*, ¶ 68).

III. *Discussion*.

   A. *Shawn M. Kuentzler Did Not Regularly
      Live at His Parents' House at the Time
      of His Death and Hence Is Not Covered
      as a Relative Under Either Policy's
      UIM Coverage*.

As the policy provision quoted above sets forth, in both policies Nationwide agreed, in pertinent part, to pay "you" or "a relative" the "compensatory damages . . . due by law . . . from the owner or driver of an underinsured motor vehicle . . . result[ing] from an accident arising out of the . . . ownership

. . . maintenance . . . or use of the underinsured motor vehicle."[2]

The general definitions section of the policies defines "you" and "relative." For our purposes, "you" and "your" means "the policyholder and spouse." In turn, "policyholder" is defined as "the first person named in the Declarations." "Relative" is defined as "one who regularly lives in your household and who is related to you by blood, marriage or adoption (including a ward or foster child). A relative may live temporarily outside your household."

Tracking the policy language, we can see that Shawn's estate qualifies for UIM coverage under both policies if he was regularly living at his parents' house. The policy promises such coverage for a relative, as defined in the policy, of the policyholder or named insured, and Defendant, Shawn's father, qualifies as either one, being so described on the declaration page. Additionally, Nationwide does not contest that Shawn's death arose out of the use of an underinsured motor vehicle, and he is, of course, related by blood to his parents. Hence, the only issue to resolve for UIM coverage is whether Shawn was

---

[2]   Nationwide also agreed to pay UIM coverage to "other persons" injured while occupying "[your] auto," meaning the car listed in the declaration page as the covered auto, or while that person was occupying a temporary substitute for the covered auto. This provision is not at issue here since Shawn Kuentzler was not riding in a covered auto at the time of his death.

"regularly liv[ing]" in his parent's household at the time of his death.

In arguing against coverage, the plaintiff insurer contends that the phrase "regularly lives in your household" is unambiguous and that the record shows that Shawn was not regularly living with his parents. Instead, as detailed above, he was living in Defiance, Ohio, with his fiancee, her son and their daughter at the time of the accident; had not lived with his parents (except for a two-month period in 2002) for at least nine years; and that he stayed at their household after 1996 only as a visitor.

In opposition, Defendant maintains that Shawn was regularly living at his parents' household and hence entitled to coverage. He relies on two arguments. First, he maintains that Shawn's other residences after June 1996 were merely temporary ones.[3] In support, Defendant points out that Shawn kept a bedroom at his parents' house, received mail there, returned at least once a month to stay there until he died, (*id.*, p. 18-19), and argues that he "kept all of his possessions" there. (Doc. 50, Def.'s Br. in Opp'n, pp. 9, 10).

_____

[3] In making this argument, Defendant agrees that Shawn "did not physically live with his parents at the time of the accident." (Doc. 50, Def.'s Br. in Opp'n, p. 6). He also agrees that "at the time of the accident, the decedent resided in Ohio with his fiancee and child." (*Id.*). He further agrees that after Shawn left his parents' house in June 1996 he lived at the different locations listed above. (Doc. 36, Pl.'s Supp. Br., p. 18).

As further support for the temporary nature of other residences, Defendant points to evidence of Shawn's intention to make his parents' house his residence. As his fiancee testified, Shawn intended to return to York and live there with her and their children, that the move to Ohio in November 2004 was only temporary, a move made so that he could save enough money to return to York. It was also his intention to live with his parents when they returned until he could find a permanent residence for his family. According to his father, Shawn considered York his home, and he wanted to live there as soon as he could find suitable employment in the area. (Doc. 36, Pl.'s Supp. Br., p. 19). In addition to this evidence of Shawn's intention to live in York, Defendant also points out the absence of evidence that Shawn intended to live permanently away from his parents' home. (Doc. 50, Def.'s Br. in Opp'n, p. 7).

Defendant supports his position that Shawn's intent is significant, if not dispositive, by pointing to that part of the definition of "relative" allowing a relative to "temporarily live outside [the] household." This language permitted Shawn to live away from his parents' home temporarily, without any limitation on the length of that absence from the household. In Defendant's view, this language makes Shawn's intent as to his residence crucial to determining whether he regularly lived at his parents' house.

12

Defendant's second argument is that, alternatively, the definition of "relative" is ambiguous, again given the language allowing a relative to be away from the household temporarily even though he must be regularly living in the household. This ambiguity must be construed in favor of the insured and for coverage. In support, Defendant contends that the facts show that Shawn lived with his parents at their York house "at multiple times in his life. The facts are equally uncontested that he lived at other addresses interspersed with his times living with his parents in their household." (Doc. 36, Pl.'s Supp. Br., p. 21). He also relies on some of the evidence mentioned above: that Shawn kept a bedroom at his parents' house, and (supposedly) all his belongings there too, that he received mail there, that he returned at least once a month, that Shawn considered York his home, that he intended to return to York with his family, and to live with his parents upon their return until he could find a permanent residence.

Under Pennsylvania law, the task of interpreting an insurance policy is generally one for the court rather than the jury. *401 Fourth Street, Inc. v. Investors Ins. Group*, 583 Pa. 445, 454, 879 A.2d 166, 171 (2005). "The purpose of that task is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy." *Id.*, 879 A.2d at 171 (citations omitted). "When the language of the policy is clear and unambiguous, a court is required to give effect to

that language," but "[w]hen a provision in a policy is ambiguous, . . . the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage." *Id.* at 455, 879 A.2d at 171 (citations omitted).

As the parties acknowledge, the same or similar insuring language has been at issue in previous cases decided under Pennsylvania law. A leading case is *Amica Mut. Ins. Co. v. Donegal Mut. Ins. Co.*, 376 Pa. Super. 109, 545 A.2d 343 (1988), which had to construe what being a "resident of your household" meant. In *Amica*, the plaintiff insurance company sued the defendant insurance company to establish that the Donegal insured's daughter had liability coverage under the Donegal policy for an accident in which she had been involved. Donegal provided such coverage to a "family member," defined in pertinent part as "a person related to the [insured] by blood . . . who is a resident of your household." *Id.* at 112 n.1, 545 A.2d at 344 n.1.

The Pennsylvania Superior Court decided that "residence" means "a factual place of abode . . . requiring only physical presence." *Id.* at 115, 545 A.2d at 346 (quoting *Krager v. Foremost Ins. Co.*, 304 Pa. Super. 390, 393-94, 450 A.2d 736, 738 (1982)). It added that a "resident" was one "who actually reside[s] in the household of the insured." *Id.* at 115, 545 A.2d

14

at 346. The court thus concluded that there was no coverage under the policy when the daughter was living with her mother, not her father (the insured) at the time of the accident.

In reaching this conclusion, the superior court rejected two arguments plaintiff Amica made in favor of coverage. First, it rejected the argument that the daughter's mere intention to live with her father satisfied the residency requirement. It did so as a general matter, *id.* at 114-15, 545 A.2d at 346, and in the specific factual context of a child of divorced parents living with one of them. *Id.* at 118, 545 A.2d at 347-48. Second, it rejected the argument that the daughter's keeping "numerous personal items at the father's house" meant she was a resident there. The latter only supported "the conclusion that she *had* lived there and that she *intended* to live there again." *Id.* at 120-21, 545 A.2d at 349 (emphasis in original).[4]

In *Nationwide Mut. Ins. Co. v. Budd-Baldwin*, 947 F.2d 1098 (3d Cir. 1991), the Third Circuit had to interpret the same Nationwide policy language at issue here. Applying Pennsylvania law, the court stated:

> Nationwide defines a covered resident relative as one who "regularly lives" in the insured's household. Something occurs regularly, if it recurs at "fixed or uniform intervals". *Webster's New Collegiate Dictionary* 974 (7th ed.1973). A person lives

---

[4] The items included a "closet or two full of clothes" and forty pairs of shoes. *Id.* at 115, 545 A.2d at 345.

>where they "occupy a home". *Webster's, supra*
>at 673. So to "regularly live" somewhere
>means to occupy that particular home at
>fixed intervals. When we combine the
>dictionary definition with the facts of
>everyday life, it is clear that to occupy a
>home means to be able to call that place
>one's own, to claim it as a place where one
>has a right to be. The word home itself
>connotes a place where one belongs and can
>always go with the certainty that he will be
>taken in. It connotes not only a physical
>place, i.e. the place where one eats meals,
>sleeps, socializes and generally spends time
>when not "otherwise engaged with the
>activities of life," but a sense of
>belonging. This definition clearly excludes
>persons who are mere visitors to the
>residence, however frequently they may visit
>and however certain they may be that they
>will always be taken in. Temporary visits,
>however frequent or regular, are simply
>insufficient to establish residency. *Donegal
>Mutual, supra,* 546 A.2d at 1214, citing *A.G.
>by Waite v. Travelers Insurance Co.,* 112
>Wis.2d 18, 21-22, 331 N.W.2d 643, 645
>(1983), ("Something more than mere temporary
>sojourn is required" to establish
>residency.).

947 F.2d at 1102-03 (footnote omitted). The Third Circuit

therefore decided that the decedent in *Budd-Baldwin* was not

entitled to first-party and UIM benefits under his sister's

Nationwide policy when his status was that of a visitor to his

sister's household, even though he came almost every weekend so

that he could visit his fiancee. *Id.* at 1103. "[H]owever

frequent or welcome his visits might have been, he did not

'regularly live' in her household; it was not the place where he

'belonged'". *Id.*

Based on *Amica* and *Budd-Baldwin*, we must agree with plaintiff Nationwide that Shawn did not regularly live at his parents' household and hence has no UIM coverage. As Plaintiff points out, when Shawn left his parents' house in June 1996, he never lived there again except for about two months from February to March of 2002. He first moved to North Carolina in June 1996 and then in 1997 to Ohio, where he lived for about five years until his two-month residence with his parents in 2002. After March 2002, he lived for about nine months in York, but not at his parents' house. In November 2004, he moved back to Defiance, Ohio, where he lived until his death in April 2005. In this factual context, we cannot agree with Defendant that all of Shawn's other residences were merely temporary and that his parents' address was his real one. In fact, the opposite would be true.

To support this argument, Defendant relies on Shawn's having kept a bedroom at his parents' house, and (supposedly) all his belongings there too, received mail there, and returned at least once a month. However, as *Amica* establishes, having belongings in the insured household is not enough. *Amica*, 370 Pa. Super. at 120-21, 545 A.2d at 349 (emphasis in original); *see also St. Paul Fire & Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1433 (3d Cir. 1991)("a public storage facility" could have served the same function as the insured's household for storing personal belongings); *Schultz v. Encompass Ins.*, 2004 WL

2075114, at *3 (E.D. Pa.). Further, there is no evidence for the assertion, made only in Defendant's briefs, that Shawn kept *all* of his belongings at his parents' house. Hence, we cannot consider that assertion on summary judgment. *See Pastore v. Bell Telephone Co.*, 24 F.3d 508, 511 (3d Cir. 1994); *Kadonsky v. New Jersey*, 188 Fed. Appx. 81, 84 (3d Cir. 2006)(nonprecedential).

Additionally, while we accept for summary-judgment purposes that Shawn returned to his parents' house once a month, we conclude those contacts were visits, and visits do not establish residency. As the Third Circuit stated in *Budd-Baldwin, supra*, the definition of "regularly resides" "clearly excludes persons who are mere visitors to the residence, however frequently they may visit and however certain they may be that they will always be taken in. Temporary visits, however frequent or regular, are simply insufficient to establish residency." 947 F.2d at 1102; *Schultz, supra*, 2004 WL 2075114, at *3 (weekend visits did not establish residency).

Finally, receiving mail at the insured residence is not relevant to whether the person lived there. *Lewis, supra*, 935 F.2d at 1433 ("a post office box" could have served the same function as the insured's household for receiving mail); *Schultz, supra*, 2004 WL 2075114, at *3.

We also cannot accept Defendant's argument that Shawn's intent as to his residence is material, if not dispositive, of his residence. Intent is not relevant, only the

18

physical presence of the alleged insured. *See Amica, supra*, 376 Pa. Super. 114-15, 545 A.2d 346; *State Farm Mut. Auto. Ins. Co. v. Quinn*, 62 Fed. Appx. 425, 430 (3d Cir. 2003)(per curiam)(nonprecedential)(decedent's intent to live with his father in the future did not qualify him for UIM coverage under his father's insurance since intent is not relevant, only physical presence); *State Farm Fire & Cas. Co. v. Colbert*, 2006 WL 3682584, at *4 (E.D. Pa.)("factual place of abode," not intent, determined residence); *Schultz, supra*, 2004 WL 2075114, at *3 ("The question of residency is not an issue of intention, but one of physical fact and presence."); *Strouss v. Fireman's Fund Ins. Co.*, 2005 WL 2989309, at *4 (E.D. Pa.).

Defendant cites only *Nationwide Mut. Ins. Co. v. White*, 1993 WL 315639 (E.D. Pa.), to support his contention that intent is important. As Defendant notes, the court in *White* did say: "The proper emphasis in determining whether an individual regularly lives in or resides in another's household includes a determination of the degree of physical presence in congruence with the individual's general intention." 1993 WL 315639 at *6. However, the reference to the individual's general intention appears to have been a stray remark in an unpublished disposition. The case actually turned on the lack of credible evidence that the person actually lived where he said he lived. Thus, *White* is in accord with Pennsylvania precedent in requiring physical presence to establish residency and does not

stand for the proposition that intent plays a part in that determination.

Nor is Defendant's argument about intent assisted by that part of the definition of "relative" allowing a relative to "temporarily live outside [the] household." This language permits a relative to live away from his parents' home temporarily, and in interpreting this language itself, intent may play a role, *see Nationwide Mut. Ins. Co. v. Ortiz*, 2001 WL 1076583, at *8-9 (M.D. Pa.), but it simply does not follow that it introduces intent into the interpretation of that part of the definition dealing with "regularly living." It merely specifies that a relative does not lose coverage by temporarily living away from the household. In the factual context of this case, we have no occasion to consider this part of the definition.[5]

Defendant's second argument for UIM coverage as a relative regularly living in the insured's household is that the definition of "relative" is ambiguous since the language allows a relative to live away from the household temporarily even though he must also be regularly living in the household. He

---

[5] In *Ortiz*, one of our colleagues took into account intent, but that case is factually different. It involved an eighteen-year-old who left his parents' house for the first time for a months-long visit to a friend in Tennessee, where he was injured. In that context, the language at issue was whether the individual was living temporarily outside the household, which would not have eliminated coverage, and intent to return to the parents' household was seen as material. 2001 WL 1076583, at *8-9.

asserts this ambiguity must be construed in favor of the insured and for coverage.

We reject this argument. Ambiguity "is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 606, 735 A.2d 100, 106 (1999); *Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 435 (3d Cir. 2006)(applying Pennsylvania law). On the facts of this case, the requirement of regularly living in the insured's household is not ambiguous, based on the undisputed facts we have already recited. To summarize, Shawn left his parents' house in June 1996 and never lived there again except for about two months from February to March of 2002, spending most of his time in Ohio, where he died in 2005. On these facts, we find no ambiguity in the requirement that a relative be regularly living in the insured's household because the definition of "relative" also includes language that will not preclude coverage if the relative happens to have temporarily left the household. Regardless of the scope of the latter language, Shawn Kuentzler was certainly not regularly living in his parents' household at the time of his death, and hence ambiguity is not an issue in this case.

In any event, the support Defendant cites for an ambiguity analysis here is lacking. He contends that the

definition of relative is ambiguous because the facts show that Shawn lived with his parents at their York house "at multiple times in his life" and the "facts are equally uncontested that he lived at other addresses interspersed with his times living with his parents in their household." (Doc. 36, Pl.'s Supp. Br., p. 21). To the contrary, Shawn did not live with his parents at multiple times in his life. He lived with them as a young man and then moved out, returning only for a two-month period in 2002. It also follows that his other residencies were not "interspersed" with living with his parents.

Defendant additionally relies on some of the evidence mentioned above: that Shawn kept a bedroom at his parents' house, and (supposedly) all his belongings there too, that he received mail there, that he returned at least once a month, that Shawn considered York his home, that he intended to return to York with his family, and to live with his parents upon their return until he could find a permanent residence. As noted above, these facts, even if true, create no ambiguity because Pennsylvania law already rejects them as sufficient to establish residence.

B.  *The Listing of Shawn M. Kuentzler on Policy No. 530 as One of the "Insured Drivers" Did Not Confer UIM Coverage Under that Policy*.

The declaration page of policy no. 530 lists Shawn as one of the "Insured Drivers" along with his parents, Elwood and

Judith Kuentzler. Defendant argues that this designation extended UIM coverage to him. Defendant reasons as follows. The policy fails to define "Insured Driver" or "driver." However, it does define "Insured" as "one who is described as entitled to protection under each coverage." Thus, the natural, plain and ordinary meaning of the term "Insured Driver" is a driver who is entitled to protection under each coverage. *See Madison Constr. Co., supra,* 557 Pa. at 608, 735 A.2d at 108 (words of an insurance policy are to be construed in their natural, plain and ordinary sense). It follows that Shawn was entitled to UIM coverage because he was an insured "under each coverage."

Alternatively, Defendant argues that the term "Insured Driver" is ambiguous and since ambiguity must be construed against the insurer, *401 Fourth Street, supra,* 583 Pa. at 455, 879 A.2d at 171, this also leads to the conclusion that there is coverage since, as Defendant argues, the ambiguity requires rejection of any argument that an insured driver has less than the protection provided under each coverage. (Doc. 36, Def.'s Supp. Br. p. 17).

In opposition, the plaintiff insurer first argues that Defendant's position has been rejected by *Caron v. Reliance Ins. Co.,* 703 A.2d 63, 68 (Pa. Super. 1997)(merely being listed as a driver on an insurance policy does not make a person a class-one insured), and *Budd-Baldwin, supra,* 947 F.2d at 1104 (being listed as an "occasional driver" is not enough to recover UIM

benefits). Second, Shawn was listed as an insured driver on the declaration page only because of Nationwide's policy of naming drivers who have regular access to the vehicle, which Shawn did when he returned to York. Regular users have to be rated, and Shawn's listing as an insured driver increased the premiums for the following coverages, comprehensive, collision, liability and first-party benefits, but not for UIM coverage.

Third, Plaintiff argues that even if the policy's definition of "Insured" is used to determine the coverage for an "Insured Driver," Shawn had no UIM coverage, if one tracks through  the pertinent policy provisions. As noted, "Insured" is defined as "one who is described as entitled to protection under each coverage." UIM coverage extends to the named insured and his spouse, and to a relative, as long as the relative was regularly living in the household. It also extends coverage to "other persons" injured while occupying the covered auto. As already established, Shawn fit none of these categories. Hence, consistent with the definition of "insured," he was *not* "one entitled to protection under [the UIM] coverage."

In reply, Defendant argues, in part, that Nationwide cannot rely on its internal reasons for listing drivers with regular access to the covered auto to defeat what the terms of the policy say. He insists that "Insured Driver" has a plain meaning when considered in relation to other policy provisions, establishing that Shawn had UIM coverage.

Looking at Defendant's argument predicated on a straightforward interpretation of the policy, we must agree with the plaintiff insurer that the policy confers no UIM coverage on an "Insured Driver" alone. Any "Insured Driver" must still meet the requirements imposed by the UIM coverage, including where relevant, satisfying the definition of "relative." As Plaintiff's analysis immediately above shows, Defendant cannot do that for Shawn.

We are also unconvinced by Defendant's ambiguity argument. To make this argument Defendant would have to proffer a reasonable interpretation of the policy's provisions supporting his contention that being listed as an "Insured Driver" makes him eligible for UIM coverage. *See 401 Fourth Street*, *supra,* 583 Pa. at 455, 879 A.2d at 171 ("Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'")(quoting *Madison Constr. Co., supra*, 557 Pa. at 606, 735 A.2d at 106). Defendant attempts no such interpretation. His ambiguity argument consists solely of asserting that if "Insured Driver" is ambiguous, Shawn was entitled to UIM coverage because the ambiguity prohibits Plaintiff from arguing "anything less than entitlement to protection under each coverage." (Doc. 36, Def.'s Supp. Br. p. 17).

C.  *Nationwide Is Not Estopped From Denying*
    *UIM Coverage Under Both Policies on the*
    *Basis that It Paid First-Party Benefits*
    *for Accidental Death and Funeral Expenses*
    *Under the Policy that Listed Shawn as an*
    *Insured Driver.*

After Shawn died, Nationwide paid his estate the accidental death benefit of $25,000 under policy No. 530. It also paid a funeral benefit in the amount of $2,500. Nationwide asserts that it paid these benefits even though Shawn did not qualify as a relative, as relative is defined for first-party benefits, because his listing as an insured driver increased the premiums for those benefits, which included the accidental death benefit and funeral expenses.

Defendant argues that both payments estop Nationwide from claiming that Shawn was not a relative under the UIM coverage. For the accidental death benefit, Defendant notes that it is payable for a "resident" of the policyholder's household related by blood and that a resident can temporarily be living outside the household. This definition is similar enough to the general definition of relative used for UIM coverage that when Nationwide paid the accidental death benefit, it must have considered Shawn to be a "relative" and a "resident" of his parents' household. Consequently, Nationwide is estopped from denying that the Decedent was a resident of his parents' household for UIM benefits.

For the funeral expenses, the reasoning is similar. Funeral expenses are paid only for an insured under the policy.

26

By paying the expenses, Nationwide must have considered Shawn an insured and is thus estopped from denying that he was an insured for UIM coverage.

Defendant cites in support of his estoppel argument *Kreutzer v. Monterey County Herald Co.*, 560 Pa. 600, 606, 747 A.2d 358, 361 (2000)(quoting *Novelty Knitting Mills v. Siskind*, 500 Pa. 432, 457 A.2d 502, 503 (1983)), where the Pennsylvania Supreme Court stated that "Equitable estoppel is a doctrine that prevents one from doing an act differently than the manner in which another was induced by word or deed to expect."

We reject this argument. We agree with Plaintiff that estoppel fails here because two essential elements are missing; Defendant was not induced to act by the payment of these first-party benefits nor did he suffer any prejudice. The insurer merely made payment of these funds and Defendant accepted them. *Kreutzer* itself, the case Defendant cites, makes this point immediately after the language quoted above; the conduct must "lead another to rely justifiably thereon to his own injury or detriment . . . ." *Id.* at 606, 747 A.2d at 361.

We will issue an appropriate order.

/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: June 14, 2007

27

```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


NATIONWIDE MUTUAL                 :
INSURANCE COMPANY,
          Plaintiff              :

                                 :
          vs.                         CIVIL NO. 1:CV-06-0646
                                 :

ELWOOD C. KUENTZLER,             :
Administrator of the Estate of
SHAWN M. KUENTZLER, Deceased,    :
          Defendant
```

## O R D E R

AND NOW, this 14th day of June, 2007, it is ordered
that:

    1.  Defendant's motion (doc. 34) for
summary judgment is denied.

    2.  Plaintiff's motion (doc. 38) for
summary judgment is granted.

    3.  It is hereby declared that there is
no underinsured motorist coverage under the
automobile policy of insurance issued by
plaintiff Nationwide Mutual Insurance
Company, to defendant, Elwood C. Kuentzler,
for any injuries sustained by the decedent,
Shawn M. Kuentzler, in the April 4, 2005,
motor vehicle accident.

    4.  Defendant is hereby enjoined from
making any claim for recovery of
underinsured motorist benefits against the
plaintiff, Nationwide Mutual Insurance
Company, in connection with any injuries
sustained by the decedent, Shawn M.
Kuentzler, in the April 4, 2005, motor
vehicle accident.

    5. The Clerk of Court shall close this
file.


                   /s/William W. Caldwell
                   William W. Caldwell
                   United States District Judge